JN:PC
F. #2021R00254

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

ORLANDO SANAY,
KEIMI NUNEZ,
KEILY NUNEZ,
MICHAEL PIMENTEL VELOZ, and
FANNY PLASENCIA,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF
THE UNITED STATES OF AMERICA FOR A
SEARCH WARRANT FOR THE PREMISES
KNOWN AND DESCRIBED AS 7623 85TH
DRIVE, SECOND FLOOR, WOODHAVEN,
NEW YORK 11421, AND 11630 GUY R.
BREWER BOULEVARD, APT. 8D,
JAMAICA, NEW YORK 11434, AND ALL
LOCKED AND CLOSED CONTAINERS
AND ELECTRONIC DEVICES LOCATED
THEREIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST AND SEARCH WARRANTS

Case No. 21-MJ-668

(18 U.S.C. §§ 1349 and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

    I, ANGEL MARTINEZ, being duly sworn, depose and state that I am a Special

Agent with the United States Department of Homeland Security, Homeland Security

Investigations, duly appointed according to law and acting as such.

    In or about and between April 2020 and November 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.      I make this affidavit in support of arrest warrants for the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA and for an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 7623 85th DRIVE, SECOND FLOOR, WOODHAVEN, NEW YORK 11421 ( "SUBJECT PREMISES-1") and 11630 Guy R. Brewer Boulevard, Apt. 8D, Jamaica, New York 11434 ("SUBJECT PREMISES-2," and together with SUBJECT PREMISES-1, the "SUBJECT PREMISES"), which are further described in Attachments A-1 and A-2, for the things described in Attachments B-1 and B-2, which constitute evidence, fruits and instrumentalities of theft of public funds, in violation of Title 18, United States Code, Section 641, disaster fraud, in violation of Title 18, United States Code, Section 1040, wire fraud, in violation of Title 18, United States Code, Section 1343, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and engaging in unlawful

monetary transactions, in violation of Title 18, United States Code, Section 1957 (together, the "SUBJECT OFFENSES").

2.      I have been a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, for three years and I have been involved in the investigation of numerous cases involving financial fraud.   I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and from reports of other law enforcement officers involved in the investigation.   Through my training, education and experience, I am familiar with the techniques and methods of operation used by individuals involved in fraud cases to conceal their activities and avoid detection by law enforcement.

3.      Because this affidavit is being submitted for the limited purpose of seeking search warrants and warrants to arrest the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA, I have not set forth each and every fact learned during the course of this investigation, but simply those facts necessary to establish probable cause to support issuance of the warrants.   Except where otherwise noted, all conversations and documents described in this affidavit are set forth in part and in substance only.

I.      The Defendants and the Relevant Entities

4.      The defendant ORLANDO SANAY is a United States citizen residing at 137 Smith Street, Apt. 2, Elizabeth, New Jersey 07201 (the "SANAY Residence").

5.      The defendant KEIMI NUNEZ is a United States citizen residing at SUBJECT PREMISES-1.

6. The defendant KEILY NUNEZ is a United States citizen residing at SUBJECT PREMISES-2. KEILY NUNEZ and the defendant KEIMI NUNEZ are twin brothers.

7. The defendant MICHAEL PIMENTEL VELOZ is a United States citizen residing at 67 Cottage Place, Apt. 1, Garfield, New Jersey 07026.

8. The defendant FANNY PLASENCIA is a United States citizen residing at SUBJECT PREMISES-2. PLASENCIA is believed to be the live-in girlfriend of the defendant KEILY NUNEZ.

9. Sanay Venture Capital LLC ("SVC") is a New York limited liability corporation formed on or about February 10, 2014 with federal tax identification number 46-4707350. The defendant ORLANDO SANAY is the chief executive officer ("CEO") and sole owner of SVC.

10. Orlando Sanay (business) is a New Jersey sole proprietorship formed on or about August 10, 2015 with federal tax identification number 05-9865466. The defendant ORLANDO SANAY is the owner of Orlando Sanay (business).

11. Innovation Transport LLC ("Innovation Transport") is a New Jersey limited liability corporation formed on or about February 27, 2015 with federal tax identification number 47-3259025. The defendant ORLANDO SANAY owns 50 percent of Innovation Transport. The rest of the business is owned by Individual-1, whose identity is known to your affiant.

12. East Coast i LLC ("East Coast") is a New York limited liability corporation formed on or about March 8, 2019 with federal tax identification number 83-3894306. The defendant KEIMI NUNEZ is CEO and sole owner of East Coast.

13. KNG Solutions LLC ("KNG") is a New York limited liability corporation formed on or about June 5, 2017 with federal tax identification number 82-1745348. The defendant KEIMI NUNEZ is the CEO and sole owner of KNG.

14. Keily Nunez Productions LLC ("KNP") is a New York limited liability corporation formed on or about October 15, 2010 with federal tax identification number 27-3683665. The defendant KEILY NUNEZ is the CEO and sole owner of KNP.

15. IBM Enterprise LLC ("IBM Enterprise") is a New Jersey limited liability corporation formed on or about March 29, 2019 with federal tax identification number 83-4104499. The defendant MICHAEL PIMENTEL VELOZ is the CEO and sole owner of IBM Enterprise.

16. FI USA Consulting LLC ("FI USA") is a New York limited liability corporation formed on or about August 14, 2017 with federal tax identification number 82-2478244. The defendant FANNY PLASENCIA is the CEO and sole owner of FI USA. The defendant KEILY NUNEZ is the manager of FI USA.

II. The Economic Injury Disaster Relief Program

17. The Economic Injury Disaster Relief Program is a United States Small Business Administration ("SBA") program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters through Economic Injury Disaster Loans ("EIDL"). The CARES Act authorized the SBA to provide an EIDL of up to $2 million to eligible small businesses who experienced substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue forgivable advances of up to $10,000 to small businesses within three days of applying for an EIDL. The advances did not have to be repaid, but EIDLs are subject to repayment and interest.

18.     In order to obtain an EIDL and/or advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees it had as of January 31, 2020, gross revenues for the twelve-month period preceding the disaster, and cost of goods sold in the twelve-month period preceding the disaster (the "Relevant Period").   In the case of EIDLs for COVID-19 relief, the twelve-month period was that preceding January 31, 2020.   The applicant was also required to electronically certify that all of the information in the application was true and correct.

19.     EIDL applications were submitted directly to the SBA through an online portal and processed by the SBA with support from a government contractor.   The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about the number of employees, gross revenues and cost of goods sold for the Relevant Period, as described above.   Any funds issued under an EIDL and any EIDL advances were issued directly by the SBA.   EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the Paycheck Protection Program ("PPP"), the EIDL funds could not be used for the same purpose as the PPP funds.

III.     The SUBJECT PREMISES

20.     The defendant KEIMI NUNEZ and his wife resides at SUBJECT PREMISES-1, which is located at 7623 85th Drive, Woodhaven, New York 11421, on the second floor, as described below.   SUBJECT PREMISES-1 is a semi-attached private home with two double glass entry doors visible from the street.   The entry to SUBJECT PREMISES-1 is the right door, accessible without entering a fenced in yard, and which is marked "76-23" near the mailbox.   Inside the entrance to SUBJECT PREMISES-1 there are believed to be two units, one

upstairs and one downstairs.   Based on EIDL applications submitted by KEIMI NUNEZ, as well

as records from Consolidated Edison, KEIMI NUNEZ lives in the second-floor apartment.

Because the SUBJECT PREMISES-1 is located in a private building, I am unable to ascertain

whether there is a separate entrance to the second-floor apartment within the building.   Based on

my experience with similar types of residences, it is likely that the second-floor apartment is

identified by its own door once you enter the building from the street.   The exterior of the

SUBJECT PREMISES-1 is pictured below.



21.     The defendants KEILY NUNEZ and FANNY PLASENCIA, as well as

twin two-year old children, reside at SUBJECT PREMISES-2, which is located at 11630 Guy R.

Brewer Boulevard, Apt. 8D, Jamaica, New York 11434.   SUBJECT PREMISES-2 is an

apartment within an eight-story red brick apartment building.   The main entrance to the building

in which SUBJECT PREMISES-2 is located is through a glass door underneath the building

address, "116-30," which is painted above the door.   SUBJECT PREMISES-2 is located on the

eighth floor of the building and is accessible through a brown door that has two signs affixed to

it: one sign has white lettering on a black background and reads, "Be nice, or leave—Thank

you," and the other sign appears to be children's art that states in large, multi-colored block

lettering, "GOD BLESS THIS FAMILY."   The entrance to the building in which SUBJECT

PREMISES-2 is located, as well as the entrance door to SUBJECT PREMISES-2, are pictured

below.





IV.     The Fraudulent Scheme

   A.     Overview

      22.     Beginning in or about at least April 2020, and continuing through in or about at least November 2020, both dates being approximate and inclusive, the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA, together with others, submitted, or caused to be submitted, fraudulent loan applications to the SBA in order to obtain more than one million dollars in EIDL funds. Among other things, the defendants misrepresented the number of employees their businesses employed and their businesses' respective revenues and cost of goods sold for the Relevant Period in order to obtain EIDL loans on behalf of SVC, Orlando Sanay (business), Innovation Transport, East Coast, KNG, KNP, IBM Enterprise and FI USA.

      23.     As explained in greater detail below, the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA, together with others, carried out the scheme together and are connected through prior employment, IP addresses used to submit and sign the EIDL applications, and familial and dating relationships.   Monetary transfers between the respective bank accounts before and after the receipt of EIDL funding also demonstrate the relationship between the co-conspirators and their involvement in the scheme.   The evidence shows that the SANAY, KEIMI NUNEZ, KEILY NUNEZ, VELOZ and PLASENCIA knowingly carried out this scheme together, as demonstrated in summary form in the below chart, including that (i) applications filed by SANAY and KEIMI NUNEZ utilized the same IP address, which IP address was associated with SANAY's current, and KEIMI NUNEZ's former employer, who also currently employs KEILY NUNEZ; (ii) twin brothers KEILY NUNEZ and KEIMI NUNEZ, as well as KEILY NUNEZ's

live-in girlfriend, PLASENCIA, submitted applications referring to the same physical addresses;

(iii) applications submitted by KEILY NUNEZ, VELOZ and PLASENCIA utilized the same IP

address, which is associated with KEILY NUNEZ and KEIMI NUNEZ's mother (the "Nunez IP

Address") and SUBJECT PREMISES-2; and (iv) the SBA flagged VELOZ's application as

fraudulent and related it to one of KEILY NUNEZ's applications.

| Defendant | Application IP Address | Application Physical Address | Employment | Relationship | SBA Documentation |
|---|---|---|---|---|---|
| Orlando Sanay | Same IP address as Keimi Nunez Applications | | Worked with Keily and Keimi Nunez | | Orlando Sanay (business) Flagged as fraud for multiple applications |
| Keimi Nunez | Same IP address as Sanay Applications | Lists subject Premises-1, which is also used by Keily Nunez and Plasencia | Worked with Sanay and Keily Nunez | Twin brother of Keily Nunez | Flagged as related to Plasencia application based on address |
| Keily Nunez | Same IP residential address as Veloz and Plasencia | Lists Subject Premises-1, which is also used by Keimi Nunez and Plasencia, and | Worked with Sanay and Keimi Nunez; manages business Plasencia owns | Twin brother of Keimi Nunez; live-in boyfriend to Plasencia, residing at Subject Premises-2 | Flagged as fraud and related to Pimentel Veloz and Plasencia applications based on IP address |
| Michael Pimentel Veloz | Uses (i) same residential IP address as Keily Nunez and Plasencia and (ii) same IP address as a Keily Nunez business | | | | Flagged as fraud and related to Keily Nunez application because it was submitted from the same device |
| Fanny Plasencia | Same IP address as Keily Nunez and Pimentel Veloz | Lists Subject Premises-1, which is also used by Keily and Keimi Nunez | Owns business Keily Nunez managers | Live-in girlfriend of Keily Nunez, residing at Subject Premises-2 | |

24.     In connection with this fraudulent scheme, the defendant ORLANDO

SANAY submitted, or caused to be submitted, the following fraudulent loan applications:[1]

| Applicant | Amount | Lender | Approximate Date of Application | Status |
|---|---|---|---|---|
| SVC | $139,500 | SBA | July 15, 2020 | Funded |
| Orlando Sanay (business) | $148,000 | SBA | August 11, 2020 | Funded |
| Innovation Transport | $150,000 | SBA | April 3, 2020 | Funded |

25.     In connection with this fraudulent scheme, the defendant KEIMI NUNEZ

submitted, or caused to be submitted, the following fraudulent loan applications:

| Applicant | Amount | Lender | Approximate Date of Application | Status |
|---|---|---|---|---|
| East Coast | $80,500 | SBA | July 13, 2020 | Funded |
| KNG | $120,500 | SBA | July 13, 2020 | Funded |

26.     In connection with this fraudulent scheme, the defendant KEILY NUNEZ

submitted, or caused to be submitted, the following fraudulent loan applications:

| Applicant | Amount | Lender | Approximate Date of Application | Status |
|---|---|---|---|---|
| KNP | $67,500 | SBA | July 12, 2020 | Funded |

27.     In connection with this fraudulent scheme, the defendant MICHAEL

PIMENTEL VELOZ submitted, or caused to be submitted, the following fraudulent loan

application:

---

[1] This chart does not reflect any forgivable advances Innovation Transport received.

| Applicant | Amount | Lender | Approximate Date of Application | Status |
|---|---|---|---|---|
| IBM Enterprise | $150,000 | SBA | July 18, 2020 | Funded |

28.     In connection with this fraudulent scheme, the defendant FANNY

PLASENCIA submitted, or caused to be submitted, the following fraudulent loan application:[2]

| Applicant | Amount | Lender | Approximate Date of Application | Status |
|---|---|---|---|---|
| FI USA | $150,000 | SBA | April 1, 2020 | Funded |

B.     Fraudulent EIDL Application Submitted on Behalf of SVC

29.     According to records obtained from the SBA, on or about July 15, 2020,

the SBA received an application in the name of SVC seeking an EIDL (the "SVC Application").

The SVC Application was submitted in the name of the defendant ORLANDO SANAY and

stated that SANAY was the sole owner and CEO of SVC.   SANAY electronically signed and

submitted the SVC Application from his and the defendants' KEILY NUNEZ and KEIMI

NUNEZ's employer's IP address (the "Employer's IP Address") to the SBA's online portal.[3]

SVC's Application lists the Sanay Residence as the SVC Application's primary address.

30.     In the SVC Application, the defendant ORLANDO SANAY represented

that SVC was established on February 10, 2014 and that SVC had 26 employees, gross revenues

of $839,000 and cost of goods sold of $560,000 for the Relevant Period.

---

[2] This chart does not reflect any forgivable advances FI USA received.

[3] The defendant KEIMI NUNEZ also used the Employer's IP Address to submit an EIDL
application for East Coast, as discussed below.

31.     The SBA approved SVC's Application and funded the loan.   On or about August 4, 2020, the SBA sent an interstate wire of $139,400[4] to the defendant ORLANDO SANAY's personal bank account ending in 0932 at Financial Institution 1, the identity of which is known to your affiant, in New Jersey (the "Sanay Personal Account 1") and which is registered with Financial Institution 1 with the Sanay Residence.

32.     The government's investigation has revealed that SVC's Application to the SBA contained a number of materially false and misleading statements.   Specifically, the defendant ORLANDO SANAY misrepresented the number of employees, gross revenues and cost of goods sold for SVC during the Relevant Period.   In contrast to the 26 employees SANAY represented on the SVC Application, New York Department of Labor records showed that SVC has never reported having any employees.   Internal Revenue Service ("IRS") records further reveal that SVC has never filed a tax return since its formation, and certainly not for the 2019 tax year, which was inconsistent with the representations that SVC had gross revenues of $839,000 and cost of goods sold of $560,000 for the Relevant Period.[5]

33.     The defendant ORLANDO SANAY's financial records further revealed that the EIDL funding was deposited into the Sanay Personal Account 1 and was not used for business purposes.   For example, on or about September 29, 2020, a payment of approximately $1,242 was made from the Sanay Personal Account 1 to BMW Financial Services for SANAY's personal vehicle.   On or about March 17, 2021, $40,000 was transferred from the Sanay

---

[4] The amount received by the borrower is often $100 less than the amount borrowed due to a $100 processing fee.

[5] The defendant ORLANDO SANAY also misstated the date SVC was established in the SVC Application, indicating that it was established on February 10, 2014, whereas public records obtained from the New York Secretary of State, show that SVC was formed on January 23, 2014.

Personal Account 1 to another personal account controlled by SANAY.   On or about October 8, 2020, $42,000 was transferred from the Sanay Personal Account to a business checking account for Innovation Transport (the "Innovation Transport Account"), ending in 9922 at Financial Institution 2, the identity of which is known to your affiant.   Based on the investigation to date, your affiant has seen no evidence that the EIDL funds were used for business purposes.

   C.  Fraudulent EIDL Application Submitted on Behalf of Innovation Transport

    34.  According to records obtained from the SBA, on or about April 3, 2020, the SBA received an application in the name of Innovation Transport seeking an EIDL (the "Innovation Transport Application").   The Innovation Transport Application was also submitted in the name of the defendant ORLANDO SANAY and stated that SANAY was the co-owner of Innovation Transport.   SANAY electronically signed and submitted the Innovation Transport Application from an IP address associated with the Sanay Residence.

    35.  In the Innovation Transport Application, the defendant ORLANDO SANAY represented that Innovation Transport had 13 employees, gross revenues of $3,179,651 and cost of goods sold of $1,849,700 for the Relevant Period.

    36.  On or about June 12, 2020, the SBA approved the Innovation Transport Application and issued a $150,000 loan, as well as a $10,000 forgivable advance on or about April 29, 2020 (for a combined total sum of $160,000), through interstate wires into the Innovation Transport Account.

    37.  The government's investigation has revealed that the Innovation Transport Application to the SBA contained a number of materially false and misleading statements. Specifically, the defendant ORLANDO SANAY misrepresented the number of employees for Innovation Transport.   In contrast to the 13 employees SANAY represented on the Innovation

Transport Application, New Jersey Department of Labor records show that Innovation Transport has not reported having any employees since 2016.   IRS records further showed that Innovation Transport did not file a tax return for the 2019 tax year, which was inconsistent with the representation that Innovation Transport had gross revenues of $3,179,651 and cost of goods sold of $1,849,700 for the Relevant Period.

38.    Moreover, financial records show that the defendant ORLANDO SANAY has made large cash withdrawals that are inconsistent with using the EIDL funds for business expenses.   For example, on or about September 25, 2020, SANAY withdrew $30,000 from the Innovation Transport Account.   The Innovation Transport Account also received deposits from two other personal bank accounts controlled by SANAY that received EIDL funding on behalf of his other business:   SVC and Orlando Sanay (business), as discussed directly above and below. Innovation Transport also transferred money to other entities owned and operated by the other defendants, including FI USA (owned and operated by the defendant FANNY PLASENCIA) and KNP (owned and operated by the defendant KEILY NUNEZ).

D.    Fraudulent EIDL Application Submitted on Behalf of Orlando Sanay (business)

39.    According to records obtained from the SBA, on or about August 11, 2020, the SBA received an application in the name of Orlando Sanay (business) seeking an EIDL (the "Orlando Sanay (business) Application").   The Orlando Sanay (business) Application was submitted in the name of the defendant ORLANDO SANAY and stated that SANAY was the sole owner of Orlando Sanay (business).   SANAY electronically signed the Orlando Sanay (business) Application and SANAY submitted it from an IP address registered to the Sanay Residence using the SBA online portal.

40.     In the Orlando Sanay (business) Application, the defendant ORLANDO
SANAY represented that Orlando Sanay (business) was established on August 10, 2015.
SANAY also represented that Orlando Sanay (business) had 13 employees, gross revenues of
$950,000 and cost of goods sold of $654,000 for the Relevant Period.

41.     The SBA approved Orlando Sanay (business)'s Application and funded
the loan.   On or about August 28, 2020, the SBA sent an interstate wire of $147,900 to the
defendant ORLANDO SANAY's personal bank account ending in 9373 at Financial Institution 2
(the "Sanay Personal Account 2"), which is associated with the Sanay Residence.

42.     The government's investigation has revealed that the Orlando Sanay
(business) Application to the SBA contained a number of materially false and misleading
statements.   Specifically, the defendant ORLANDO SANAY misrepresented the number of
employees, gross revenues and cost of goods sold for Orlando Sanay (business) during the
Relevant period.   In contrast to the 13 employees SANAY represented on the Orlando Sanay
(business) Application, New York Department of Labor records show that Orlando Sanay
(business) has never reported having any employees.   SANAY's representations as to the gross
revenues and costs of goods sold for the Relevant Period for Orlando Sanay (business) also are
inconsistent with IRS records.   In fact, IRS records show that SANAY has filed tax returns that
include tax information for Orlando Sanay (business), but those tax returns are inconsistent with
the gross revenue and cost of goods sold representations SANAY made in the Orlando Sanay
(business) Application.

43.     The defendant ORLANDO SANAY's financial records further revealed
that the EIDL funding Orlando Sanay (business) received was deposited into the Sanay Personal
Account 2 and not used to cover the operating expenses of Orlando Sanay (business).   Financial

records show that over roughly a one-month period nearly all of the $149,900 in SBA funding

was transferred to the Innovation Transport Account, as defined above (another business owned

by SANAY and Individual-1).   Individual-1 separately applied for and received PPP funding for

Innovation Transport, resulting in Innovation Transport receiving $92,900 in PPP funding,

despite the fact that Innovation Transport had reported no employees to the Department of Labor

and that PPP funding was required to be used for payroll.   As explained above, Innovation

Transport also transferred EIDL money to entities owned and operated by the defendants

FANNY PLASENCIA and KEILY NUNEZ.   Based on the investigation to date, your affiant

has seen no evidence the EIDL funds were used for Orlando Sanay (business)'s purposes.

       E.     <u>Fraudulent EIDL Application Submitted on Behalf of East Coast</u>

       44.     According to records obtained from the SBA, on or about July 13, 2020,

the SBA received an application in the name of East Coast seeking an EIDL (the "East Coast

Application").   The East Coast Application was submitted in the name of the defendant KEIMI

NUNEZ and stated that KEIMI NUNEZ was the sole owner and CEO of East Coast.   KEIMI

NUNEZ electronically signed the East Coast Application and submitted it from the Employer's

IP Address, which is the same IP address the defendant ORLANDO SANAY used to file the

SVC Application.

       45.     In the East Coast Application, the defendant KEIMI NUNEZ represented

that East Coast was established on March 8, 2019.   KEIMI NUNEZ also represented that East

Coast had 26 employees, gross revenues of $694,000 and cost of goods sold of $533,000 for the

Relevant Period.   KEIMI NUNEZ also used the address for SUBJECT PREMISES-1, without

indicating an apartment, as the primary and business contact address in the East Coast

Application.   As described below, this is the same address used by the defendant KEILY NUNEZ in the KNP Application.

46.     The SBA approved East Coast's Application and funded the loan.   On or about August 4, 2020, the SBA sent an interstate wire of $80,500 to the defendant KEIMI NUNEZ's personal bank account ending in 6879 at Financial Institution 1 (the "Keimi Nunez Personal Account 1"), for which he is the sole signatory.   Statements for the Keimi Nunez Personal Account 1 list SUBJECT PREMISES-1, without an apartment number, as the primary address for the bank account.   However, account profile information for the Keimi Nunez Personal Account 1 lists SUBJECT PREMISES-2, without an apartment number, as the address associated with the account.

47.     The government's investigation has revealed that the East Coast Application to the SBA contained a number of materially false and misleading statements. Specifically, the defendant KEIMI NUNEZ misrepresented the number of employees and gross revenues and costs of goods sold for East Coast.   In contrast to the 26 employees KEIMI NUNEZ represented on the East Coast Application, New York Department of Labor records show that East Coast has never reported having any employees.   IRS records show that East Coast has never filed a tax return since its formation, which is inconsistent with the representation that East Coast had gross revenues of $694,000 and cost of goods sold of $533,000 for the Relevant Period.

48.     The defendant KEIMI NUNEZ's financial records further revealed that the $80,500 in EIDL funding that was deposited into the Keimi Nunez Personal Account 1 was not used for East Coast's business purposes.   For example, on or around August 17, 2020, $80,000 in cash was withdrawn from the Keimi Nunez Personal Account 1.   That money was

subsequently deposited into a personal savings account ending in 0539 at Financial Institution 3 (the "Keimi Nunez Joint Account"), an entity the identity of which is known to your affiant, that was opened in August 2020 in the name of KEIMI NUNEZ and his wife.   Based on the investigation to date, your affiant has seen no evidence that the EIDL funds were used for business purposes.

        F.      <u>Fraudulent EIDL Application Submitted on Behalf of KNG</u>

        49.     According to records obtained from the SBA, on or about July 13, 2020, the same day as the East Coast Application described above, the SBA received an application in the name of KNG seeking an EIDL (the "KNG Application").   The KNG Application was submitted in the name of the defendant KEIMI NUNEZ and stated that KEIMI NUNEZ was the sole owner and CEO of KNG.   KEIMI NUNEZ electronically submitted the KNG Application using the SBA's online portal and listed SUBJECT PREMISES-1 as a primary contact and business address.   As described below, this is the same physical address the defendant KEILY NUNEZ used for the KNP Application and that the defendant FANNNY PLASENCIA used for the FI USA Application.   The application was electronically signed from an IP address registered to SUBJECT PREMISES-1, but without an apartment designation.

        50.     In the KNG Application, the defendant KEIMI NUNEZ represented that KNG was established on June 5, 2017.   KEIMI NUNEZ also represented that KNG had 23 employees, gross revenues of $784,000 and cost of goods sold of $543,000 for the Relevant Period.

        51.     The SBA approved the KNG Application and funded the loan.   On or about August 4, 2020, the SBA sent an interstate wire of $120,400 to the defendant KEIMI

NUNEZ's bank account ending in 0261 at Financial Institution 2 (the "Keimi Nunez Personal Account 2"), on which KEIMI NUNEZ and his wife were co-signers.

52.     The government's investigation has determined that the KNG Application to the SBA contained materially false and misleading statements.   The defendant KEIMI NUNEZ's representations regarding KNG's employees, gross revenues and costs of goods sold were false.   In contrast to the 23 employees KEIMI NUNEZ represented on the KNG Application, New York Department of Labor records showed that KNG has never reported having any employees.   KEIMI NUNEZ's representations in the KNG Application as to KNG's gross revenues and costs of goods sold also were inconsistent with IRS records, which show that KNG has never filed a tax return since its formation.

53.     The defendant KEIMI NUNEZ's financial records further reveal that the $120,400 in EIDL funding deposited into the Keimi Nunez Personal Account 2 was not used for business purposes.   On or about August 14, 2020, KEIMI NUNEZ withdrew $119,900 in cash from the Keimi Nunez Personal Account 2.   On or about August 17, 2020, $119,900 was deposited into the Keimi Nunez Joint Account that also received $80,000 in funds from East Coast's EIDL.   Based on the investigation to date, your affiant has seen no evidence that the EIDL funds received by KNG were used for business purposes.

G.     Fraudulent EIDL Application Submitted on Behalf of KNP

54.     According to records obtained from the SBA, on or about July 12, 2020, the SBA received an application in the name of KNP seeking an EIDL (the "KNP Application"). The KNP Application was submitted in the name of the defendant KEILY NUNEZ, stated that KEILY NUNEZ was KNP's owner and CEO, and listed the SUBJECT PREMISES-1 address as KNP's primary contact.   KEILY NUNEZ electronically signed the KNP Application and submitted it using the SBA's online portal.

55.     In the application, the defendant KEILY NUNEZ represented that KNP had four employees and gross revenues of $396,000 for the Relevant Period.

56.     The SBA approved KNP's application and funded the loan.   On or about August 7, 2020, the SBA sent an interstate wire of $67,400 to the defendant KEILY NUNEZ's personal checking account (the "Keily Nunez Account") ending in 9199 at Financial Institution 2.

57.     The government's investigation has determined that the KNP Application to the SBA contained materially false and misleading statements.   The defendant KEILY NUNEZ's representations regarding KNP's employees, gross revenues and costs of goods sold were false.   In contrast to the four employees KEILY NUNEZ represented in the KNP Application, New York Department of Labor records show that KNP has never reported having any employees.   KEILY NUNEZ's representations as to KNP's gross revenues and costs of goods sold in the KNP Application also were false because IRS records showed that KNP had not filed a tax return since its formation, which is inconsistent with the representations that it had gross revenues and cost of goods sold.

58.     The defendant KEILY NUNEZ's financial records further revealed that the EIDL funding was deposited into the Keily Nunez Account and not used for business purposes.   For example, on or about September 17, 2020, KEILY NUNEZ transferred $20,000 from the Keily Nunez Account to his personal account at another bank.   The Keily Nunez Account also showed numerous deposits for unemployment benefits for KEILY NUNEZ during calendar year 2020 and at least one payment to a personal credit card in the name of KEILY NUNEZ, further demonstrating that the funds and the account were not used for business purposes.   The Keily Nunez Account also received deposits from Innovation Transport, the

defendant ORLANDO SANAY's company, which also received fraudulent EIDL funding. Based on the investigation to date, your affiant has seen no evidence the EIDL funds provided to KNP were used for business purposes.

       H.    <u>Fraudulent EIDL Application Submitted on Behalf of IBM Enterprise</u>

       59.    According to records obtained from the SBA, on or about July 18, 2020, the SBA received an application in the name of IBM Enterprise seeking an EIDL (the "IBM Enterprise Application") that was submitted from the Nunez IP Address.   The application was submitted in the name of the defendant MICHAEL PIMENTEL VELOZ and stated that he was IBM Enterprise's CEO and owner.   VELOZ electronically signed the IBM Enterprise Application and submitted it using the SBA's online portal.   The SBA's online portal flagged the IBM Enterprise Application as "fraud" and associated it with the defendant KEILY NUNEZ and the KNP Application because it was submitted from the same device.

       60.    In the application, the defendant MICHAEL PIMENTEL VELOZ represented that IBM Enterprise had 31 employees and gross revenues of $1,234,000 for the Relevant Period.

       61.    The SBA approved IBM Enterprise's Application and funded the loan. On or about July 19, 2020, the SBA sent an interstate wire of $149,900 to the defendant MICHAEL PIMENTEL VELOZ's personal checking account ending in 7701 (the "Veloz Account") at Financial Institution 1.   VELOZ is the only signatory on the Veloz Account.

       62.    The government's investigation has determined that the IBM Enterprise Application to the SBA contained materially false and misleading statements.   The defendant MICHAEL PIMENTEL VELOZ's representations regarding IBM Enterprise's employees and gross revenues were false.   In contrast to the 31 employees that VELOZ represented in the IBM

Enterprise Application, New York Department of Labor records showed that IBM Enterprise had never reported having any employees.   VELOZ's representations as to IBM Enterprise's gross revenues also were inconsistent with IRS records, which showed that IBM Enterprise had never filed a tax return since its formation.

   63. Financial records revealed that the EIDL funds deposited into the Veloz Account were not used for IBM Enterprise's business purposes.   For example, on or about and between approximately October 15, 2020 and November 27, 2020, $148,925 of the $149,900 in EIDL funds were withdrawn from the Veloz Account in three large transactions.   Based on the investigation to date, your affiant has seen no evidence the EIDL funds provided to IBM Enterprise were used for business purposes.

   I. <u>Fraudulent EIDL Application Submitted on Behalf of FI USA</u>

   64. According to records obtained from the SBA, on or about April 1, 2020, the SBA received an application in the name of FI USA seeking EIDL funding (the "FI USA Application").   The FI USA Application was submitted in the name of the defendant FANNY PLASENCIA and stated that PLASENCIA was the sole owner and CEO of FI USA.   The FI USA Application also stated the defendant KEILY NUNEZ was FI USA's manager.   The FI USA Application listed SUBJECT PREMISES-1 (the defendant KEIMI NUNEZ's address), in the applicant contact information.   PLASENCIA electronically signed the FI USA Application and submitted it via the SBA's online portal using the Nunez IP address, which is associated with SUBJECT PREMISES-2.[6]

---

[6] The investigation has revealed that at least one other EIDL application was submitted from the Nunez IP Address registered to SUBJECT PREMISES-2 by Individual-2, an individual whose identity is known to your affiant and who does not reside at SUBJECT PREMISES-2.   This EIDL application was ultimately denied by the SBA.

65.     In the application, the defendant FANNY PLASENCIA represented that FI USA had 42 employees and gross revenues of $672,137 for the Relevant Period.

66.     The SBA approved FI USA's Application and on or about April 24, 2020, issued a $10,000 forgivable advance through an interstate wire to a business checking account (the "FI USA Account") ending in 9293 at Financial Institution 2.   On or about July 13, 2020, the SBA sent an interstate wire of $149,900 to the FI USA Account.

67.     The government's investigation has determined that the FI USA Application to the SBA contained materially false and misleading statements.   The defendant FANNY PLASENCIA's representations regarding FI USA's employees and revenues were false.   In contrast to the 42 employees represented in the FI USA Application, New York Department of Labor records showed that FI USA had never reported having any employees. PLASENCIA's representations as to FI USA's gross revenues were also inconsistent with IRS records, which showed that FI USA had not filed a tax return since its formation.

68.     Financial records reveal that EIDL funding deposited into the FI USA Account was not used for business expenses.   For example, on or about and between approximately October 1, 2020 and November 10, 2020, the defendant FANNY PLASENCIA made cash withdrawals totaling approximately $71,000 from the FI USA Account.   As noted above, in December 2019, PLASENCIA transferred approximately $41,500 from the FI USA Account to Innovation Transport, which was partly owned by the defendant ORLANDO SANAY, and Innovation Transport also received EIDL funding from Orlando Sanay (business), which in turn received EIDL funding from KNP, which was owned by the defendant KEILY NUNEZ.   The FI USA Account also received deposits totaling $16,000 from Innovation Transport.   After receiving the EIDL funding, PLASENCIA made numerous transfers from the

FI USA Account, totaling approximately $22,900, to JK Auto, an entity owned by KEILY

NUNEZ.[7]   Based on the investigation to date, your affiant has seen no evidence that the EIDL

funds provided to FI USA were used for business purposes.

V.   Probable Cause to Search the SUBJECT PREMISES

      69.   In sum, the foregoing shows that the paper records, banking statements,

and electronic records related to the fraudulent EIDL applications and the funds disbursed in

connection with those fraudulent applications that were submitted by or caused to be submitted

by the defendants KEIMI NUNEZ, KEILY NUNEZ and FANNY PLASENCIA are currently

located at the SUBJECT PREMISES.   Accordingly, based on the above, there is probable cause

to believe that an examination of the things described in Attachments B-1 and B-2 that are

located in the SUBJECT PREMISES will provide evidence, fruits and instrumentalities of

violations of federal law, including the SUBJECT OFFENSES.   This application seeks to search

the SUBJECT PREMISES and any locked and closed containers therein, as well as any

electronic devices belonging to the KEIMI NUNEZ, KEILY NUNEZ and PLASENCIA that are

found within the SUBJECT PREMISES.[8]

      70.   Significant quantities of cash may also be found within the SUBJECT

PREMISES.   The foregoing shows that the defendant FANNY PLASENCIA made numerous

large cash withdrawals from the bank accounts that received EIDL funding.   Specifically,

between approximately July 6, 2020 and November 10, 2020, FANNY PLASENCIA withdrew

---

[7] JK Auto also applied for and was denied EIDL funding using the defendant KEILY NUNEZ's
personal address, SUBJECT PREMISES-2.

[8] This application does not seek to search any electronic devices found within the SUBJECT
PREMISES that do not belong to the defendants KEIMI NUNEZ, KEILY NUNEZ and
FANNY PLASENCIA, and does not seek to seize and search any electronic devices
belonging to KEIMI NUNEZ's wife, who resides at SUBJECT PREMISES-1.

cash in excess of approximately $105,000.   The cash does not appear to have been deposited into any other bank account known to the government to be owned or controlled by PLASENCIA or her co-conspirators.

71.     Based on my training and experience, I know that individuals who commit fraud and money laundering often use the proceeds of their fraud to purchase luxury items, including but not limited to jewelry and artwork.   To the extent that valuable items within the SUBJECT PREMISES were purchased using funds received from EIDLs, such items would constitute evidence, fruits and instrumentalities of the SUBJECT OFFENSES.   This application therefore requests permission to seize any valuable items that law enforcement is able to determine, through interviews of the defendants or otherwise, were purchased using EIDL funding.

VI.     <u>TECHNICAL BACKGROUND</u>

72.     As described above and in Attachments B-1 and B-2, this application seeks permission to search for records constituting evidence, fruits or instrumentalities of the SUBJECT OFFENSES enumerated here that might be found in the SUBJECT PREMISES, in whatever form they are found.   One form in which the records are likely to be found, based upon the information obtained in our investigation, is in the form of data stored on a computer's hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

73.     I submit that if a computer[9] or storage medium[10] is found on the SUBJECT PREMISES, as anticipated based upon our investigation, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

---

[9] For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[10] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.   Examples include external hard drives, CDs, DVDs and flash drives.

c.      Wholly apart from user-generated files, computer storage media –
in particular, computers' internal hard drives – contain electronic evidence of how a computer
has been used, what it has been used for, and who has used it.   To give a few examples, this
forensic evidence can take the form of operating system configurations, artifacts from the use of
an operating system or application, file system data structures and virtual memory "swap" or
paging files.   Computer users typically do not erase or delete this evidence, because special
software is typically required for that task.   However, it is technically possible to delete this
information.

d.      Similarly, files that have been viewed via the Internet are
sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      Based on the facts described above, and other evidence related to
this investigation, I am aware that computer equipment was used to, among other things,
generate, submit and store documents used in the EIDL fraud scheme.

74.      As further described in Attachments B-1 and B-2, this application seeks
permission to locate not only electronic computer files that might serve as direct evidence of the
crimes described on the warrant, but also for forensic electronic evidence that establishes how
the computers were used, the purpose of their use, who used them, and when.   There is probable
cause to believe that this forensic electronic evidence will be on any storage medium in the
SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was
once on the storage medium but has since been deleted or edited, or of a deleted portion of a file
(such as a paragraph that has been deleted from a word processing file).   Virtual memory paging
systems can leave traces of information on the storage medium that show what tasks and

processes were recently active.   Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.      In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history and anti-virus, spyware and malware detection programs) can indicate who has used or controlled the computer or storage media.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use and events relating to the crime under investigation.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the

physical location of other evidence and the suspects.   For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.   Such file data typically also contains information indicating when the file or image was created.   The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).   The geographic and timeline information described herein may either inculpate or exculpate the computer user.   Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.   For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

       c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular

item is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

75.     In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

a.     The time required for an examination.   As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.   Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable.   Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

configurations.   Therefore, searching them sometimes requires tools or knowledge that might

not be present on the search site.   The vast array of computer hardware and software available

makes it difficult to know before a search what tools or knowledge will be required to analyze

the system and its data on the SUBJECT PREMISES.   However, taking the storage media off-

site and reviewing it in a controlled environment will allow its examination with the proper tools

and knowledge.

     c.  The variety of forms of electronic media.   Records sought under

this warrant could be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

     76.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant

I am applying for would authorize seizing, imaging or otherwise copying computers and storage

media that reasonably appear to contain some or all of the evidence described in the warrant, and

would authorize a later review of the media or information consistent with the warrant.   The

later review may require techniques, including, but not limited to, computer-assisted scans of the

entire medium, that might expose many parts of a hard drive to human inspection in order to

determine whether it is evidence described by the warrant.

     77.  As with any search warrant, I expect that this warrant will be executed

reasonably.   Reasonable execution will likely involve conducting an investigation on the scene

of what computers, or storage media, must be seized or copied, and what computers or storage

media need not be seized or copied.   Where appropriate, officers will copy data, rather than

physically seize computers.   If, after inspecting the computers, it is determined that some or all

of this equipment is no longer necessary to retrieve and preserve the evidence, the government

will return it.

VII.    SPECIAL INSTRUCTION REGARDING REVIEW OF THE SEIZED MATERIAL

78.     With respect to law enforcement's review of the seized material identified in Attachments B-1 and B-2, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") shall review, in the first instance, the seized material.

79.     If, during the review of the seized material, the Review Team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue. Nothing in this Affidavit shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

VIII.   Conclusion

Based on the above facts, I respectfully submit that there is probable cause to believe that the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1349.  I further submit that, based on the foregoing facts, there is probable cause to search the SUBJECT PREMISES.

80.     I request that the Court order that all papers in support of this application, including the affidavit, arrest warrants and search warrants, be sealed until further order of the Court, other than for the purpose of sharing with other law enforcement agencies and the District Court in the District of New Jersey for purposes of effectuating arrest and additional search warrants out of this District.   These documents discuss an ongoing criminal investigation that is neither public nor known to the targets and subjects of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets and subjects an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

WHEREFORE, your deponent respectfully requests that the Court issue search warrants for the SUBJECT PREMISES and that the defendants ORLANDO SANAY, KEIMI NUNEZ, KEILY NUNEZ, MICHAEL PIMENTEL VELOZ and FANNY PLASENCIA be dealt with according to law.

_____
ANGEL MARTINEZ
Special Agent, United States Department of
Homeland Security, Homeland Security
Investigations

Sworn to before me by reliable electronic means this
8th day of June, 2021

/s Roanne L. Mann
_____
THE HONORABLE ROANNE L. MANN
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**ATTACHMENT A-1**

Property to Be Searched

SUBJECT PREMISES-1 is located at 7623 85th Drive, Second Floor, Woodhaven, New York 11421 and is the residence of the defendant KEILY NUNEZ. SUBJECT PREMISES-1 is a semi-attached private home with two double glass entry doors visible from the street.   The exterior entry to SUBJECT PREMISES-1 is the right door, accessible without entering a fenced in yard, and which is marked "76-23" near the mailbox. Inside the exterior entrance to SUBJECT PREMISES-1 there are believed to be two units, one upstairs and one downstairs.   Based on EIDL applications submitted by KEIMI NUNEZ and records from Consolidate Edison, KEIMI NUNEZ lives in the second-floor apartment and rents the first floor to a tenant.   Because SUBJECT PREMISES-1 is located within a private building, agents have been unable to ascertain whether there is a separate entrance to the second-floor apartment within the building, but it is likely that the second-floor apartment is identified by its own door once you enter the building from the street.   The exterior of SUBJECT PREMISES-1 is pictured below.   The property to be searched includes SUBJECT PREMISES-1 and any locked and closed containers therein, as well as any electronic devices belonging to KEIMI NUNEZ.



# ATTACHMENT A-2

## Property to Be Searched

SUBJECT PREMISES-2 is an apartment located at 11630 Guy R. Brewer Boulevard, Apt. 8D, Jamaica, New York 11434 and is the residence of the defendants KEILY NUNEZ and FANNY PLASENCIA.   SUBJECT PREMISES-2 is an apartment within an eight-story red brick apartment building.   The main entrance to the building in which SUBJECT PREMISES-2 is located is a glass door underneath the building address, "116-30," which is painted above the door.   SUBJECT PREMISES-2 is located on the eighth floor of the building and is accessible through a brown door that has two signs affixed to it:   one sign has white lettering on a black background and reads, "Be nice, or leave—Thank you," and the other sign appears to be children's art that states in large, multi-colored block lettering, "GOD BLESS THIS FAMILY."   The entrance to the building in which SUBJECT PREMISES-2 is located, as well as the entrance door to SUBJECT PREMISES-2, are pictured below.   The property to be searched includes SUBJECT PREMISES-2 and any locked and closed containers therein, as well as any electronic devices belonging to KEILY NUNEZ and PLASENCIA.





**ATTACHMENT B-1**

I.    Particular Things to be Seized

1.    All records and information relating to violations of Title 18, United States Code, Sections 641, 1040, 1343, 1349, 1956, 1957 and 2 (the "SUBJECT OFFENSES") from April 1, 2020 to the present, involving the submission of applications for Economic Injury Disaster Loans ("EIDL") issued by the Small Business Administration ("SBA") and the receipt and use of EIDL funds, including, but not limited to:[11]

a.    Documents constituting, concerning, or relating to applications for EIDL funding, including, but not limited to, any business records, banking records, credit histories, or other documents submitted as part of the application process.

b.    All contracts, agreements and affiliated records constituting, concerning or relating to the provision of business services by the defendants KEIMI NUNEZ, KEILY NUNEZ and FANNY PLASENCIA, or their businesses, Keily Nunez Productions, East Coast i LLC, KNG Solutions LLC, and FI USA Consulting LLC, including invoices and receipts for their businesses.

c.    All correspondence and cancelled checks relating to the use of EIDL funds by the defendants KEIMI NUNEZ, KEILY NUNEZ and FANNY PLASENCIA, or

---

[11] For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

their businesses, Keily Nunez Productions, East Coast i LLC, KNG Solutions LLC, and FI USA Consulting LLC.

        d.     All correspondence to and from the Small Business Administration.

        e.     Financial books and records, including but not limited to:

        (1)     Bank Accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

        (2)     Credit card/ATM/debit card accounts.

        f.     All contracts, agreements, logs, lists or records affiliated with any business services provided by the defendants KEIMI NUNEZ, KEILY NUNEZ and FANNY PLASENCIA, or their businesses, Keily Nunez Productions, East Coast i LLC, KNG Solutions LLC, and FI USA Consulting LLC, or by their representatives and employees.

        2.     Computers[12] or storage media[13] that contain records or information (hereinafter "COMPUTERS") used as a means to commit violations of Title 18, United States Code, Section 1343.  All information obtained from such COMPUTERS will be maintained by the government for the purpose of authentication and any potential discovery obligations in any

---

[12] A computer includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers and network hardware, such as wireless routers.

[13] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.   Examples include external hard drives, CDs, DVDs and flash drives.

related prosecution.   The information shall be reviewed by the government only for the purpose

of identifying and seizing information that constitutes fruits, evidence and instrumentalities of

the SUBJECT OFFENSES, including:

a.      evidence of who used, owned or controlled the COMPUTERS at

the time the things described in this warrant were created, edited, or deleted, such as logs,

registry entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs and

correspondence;

b.      evidence of software that would allow others to control the

COMPUTERS, such as viruses, Trojan horses and other forms of malicious software, as well as

evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTERS of other storage

devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that

are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTERS were used;

g.      evidence of the COMPUTERS being remotely accessed or

remotely accessing other computers;

h.      passwords, encryption keys and other access devices that may be

necessary to access the COMPUTERS;

i.      documentation and manuals that may be necessary to access the

COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

    j.  contextual information necessary to understand the evidence described in this Attachment.

    3.  Records and things evidencing the use of the Internet Protocol addresses to communicate with SBA's websites or EIDL submission portal(s), including:

    a.  routers, modems and network equipment used to connect computers to the Internet;

    b.  Internet Protocol addresses used by the COMPUTERS; and

    c.  records or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine and records of user-typed web addresses.

II. <u>Treatment of Potentially Privileged Information</u>

    With respect to law enforcement's review of the materials seized pursuant to this search warrant (the "Materials"), law enforcement (<u>i.e.</u>, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Information (collectively, the "Review Team") shall review, in the first instance, the Materials.

    If law enforcement determines that all, some or a portion of the Materials constitutes or may contain material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team will: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this Attachment shall be construed to require law enforcement to cease or suspend the Review Team's review of the Materials upon discovery of the existence of Potentially Privileged Materials within the Materials.

**ATTACHMENT B-2**

II.     Particular Things to be Seized

1.      All records and information relating to violations of Title 18, United States Code, Sections 641, 1040, 1343, 1349, 1956, 1957 and 2 (the "SUBJECT OFFENSES") from April 1, 2020 to the present, involving the submission of applications for Economic Injury Disaster Loans ("EIDL") issued by the Small Business Administration ("SBA") and the receipt and use of EIDL funds, including, but not limited to:[14]

a.      Documents constituting, concerning, or relating to applications for EIDL funding, including, but not limited to, any business records, banking records, credit histories, or other documents submitted as part of the application process.

b.      All contracts, agreements and affiliated records constituting, concerning or relating to the provision of business services by the defendants KEILY NUNEZ, and FANNY PLASENCIA, or their businesses, Keily Nunez Productions and FI USA Consulting LLC, including invoices and receipts for their businesses.

c.      All correspondence and cancelled checks relating to the use of EIDL funds by the defendants KEILY NUNEZ and FANNY PLASENCIA, or their businesses, Keily Nunez Productions and FI USA Consulting LLC.

---

[14] For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

d.      All correspondence to and from the Small Business

Administration.

e.      Financial books and records, including but not limited to:

(1)      Bank Accounts, money market accounts, checking

accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds,

bonds or bond fund, including deposits and disbursements, cancelled checks or draft electronic

transfers, ledgers, loan statements, loan agreements; and

(2)      Credit card/ATM/debit card accounts.

f.      All contracts, agreements, logs, lists or records affiliated with any

business services provided by the defendants KEILY NUNEZ and FANNY PLASENCIA, or

their businesses, Keily Nunez Productions and FI USA Consulting LLC, or by their

representatives and employees.

2.      Computers[15] or storage media[16] that contain records or information

(hereinafter "COMPUTERS") used as a means to commit violations of Title 18, United States

Code, Section 1343.   All information obtained from such COMPUTERS will be maintained by

the government for the purpose of authentication and any potential discovery obligations in any

related prosecution.   The information shall be reviewed by the government only for the purpose

of identifying and seizing information that constitutes fruits, evidence and instrumentalities of

---

[15] A computer includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers and network hardware, such as wireless routers.

[16] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.   Examples include external hard drives, CDs, DVDs and flash drives.

the SUBJECT OFFENSES, including:

     a.     evidence of who used, owned or controlled the COMPUTERS at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs and correspondence;

     b.     evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.     evidence of the lack of such malicious software;

     d.     evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

     e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

     f.     evidence of the times the COMPUTERS were used;

     g.     evidence of the COMPUTERS being remotely accessed or remotely accessing other computers;

     h.     passwords, encryption keys and other access devices that may be necessary to access the COMPUTERS;

     i.     documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

     j.     contextual information necessary to understand the evidence described in this Attachment.

3.      Records and things evidencing the use of the Internet Protocol addresses to communicate with SBA's websites or EIDL submission portal(s), including:

a.      routers, modems and network equipment used to connect computers to the Internet;

b.      Internet Protocol addresses used by the COMPUTERS; and

c.      records or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine and records of user-typed web addresses.

II.    Treatment of Potentially Privileged Information

With respect to law enforcement's review of the materials seized pursuant to this search warrant (the "Materials"), law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Information (collectively, the "Review Team") shall review, in the first instance, the Materials.

If law enforcement determines that all, some or a portion of the Materials constitutes or may contain material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team will: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this Attachment shall be construed to require law enforcement to cease or suspend the Review Team's review of the Materials upon discovery of the existence of

Potentially Privileged Materials within the Materials.